We will call 24-3006 Cornish-Santiago Blair v. Caesars. Mr. Fields, whenever you're ready, sir. Thank you, Your Honor. Good afternoon. Zach Fields from Sussman Godfrey on behalf of the Plaintiffs and Prospective class. We have alleged that the casino hotels here each use Rainmaker to set the prices that they overwhelmingly adopt to charge guests. You say overwhelmingly. What is the percentage in the complaint? Your Honor, we allege that nationwide, or I should say globally, 90 percent of the pricing recommendations from Rainmaker are accepted. That was found sufficient in the RealPage case, which I think really is the best analog. In terms of trying to get a handle on this thing, I think you'd agree that if it was 50-50, if half the time the recommendations were accepted, half the time they weren't, you wouldn't have enough to show an agreement. It certainly wouldn't be a per se violation, and it wouldn't meet the rule of reason, would it? Your Honor, I think that the Supreme Court's decision in Saucony Vacuum Oil would help to answer that question. There, the Court said that even a starting formula that you use to set prices could be sufficient to state a claim. You really have to take, you know, the acceptance rate is but one of many factors. And ultimately, what the district court— It has to be collusion. It's correct, Your Honor. There has to at least be some classic— If they're rejecting the recommendation, say, as often as they're accepting it, is that sufficient to show collusion? Your Honor, I think you would have to take in totality, you know, this Court and Birch, for instance, outlined a number of plus factors. It's applied those consistently since. And Judge Smith's opinion in West Penalegany, you know, made quite clear that in antitrust context, plausibility doesn't get some sort of extra bite. You apply the same Twombly standard. So look all at one, you know, altogether, all of these factors. You know, if perhaps the rates were being rejected 50 percent of the time, but you still have evidence of confidential data sharing, or you still have evidence of policing mechanisms to ensure that the casinos were accepting those prices at least half of the time, you know, with 80 percent market power, that may still be sufficient to state a claim. Of course, that's not our case here, Your Honor. It's 80, and I posited 50. I understand what you're saying. 80 percent market power, to be clear, Your Honor. So even accepting the rates half of the time, if you own 80 percent of the market, I think probably would be sufficient to state a claim. The market is Atlantic City casino hotels, and we think that that's a perfectly, you know, acceptable market definition that New Jersey courts have credited. You know, in the Gibson case, which obviously the Ninth Circuit just decided, there was never any real question about whether casino hotels on the Vegas Strip satisfied a market. I think Atlantic City for the same reason. Okay. It's Atlantic City casino hotels. So really you're looking at eight different properties, Your Honor. The only three that are non-defendant casino hotels are the Golden Nugget, Resorts, and Ocean. And if any of you all, like Blackjack, have been to Atlantic City like I have, you know that Ocean sort of sits as a luxury product on the market, and that, you know, Resorts Casino and Golden Nugget sort of sit as discount properties. So it's really every other casino hotel in Atlantic City. We're talking about five different properties, I should say. That's correct, Your Honor, until the sale of Valleys. Yeah, so I should say it's five casino hotel defendants. There are more casinos under each of those defendants. That's correct. So we have alleged, again, that you have this overwhelming adoption of Rainmakers' prices. We have alleged that the casino hotels adopt those prices knowing that, and indeed because their competitors are doing the same thing. Does it matter that they opted into the system at different times? Your Honor, I'm glad that you asked the timing question. I'll give you one answer as a matter of law and one as a matter of fact. So as a matter of law, I think that the Supreme Court and interstate circuit was quite clear that you can state an antitrust conspiracy without simultaneous agreement. And, in fact, in the West Penalty case, you had conduct that took place over the course of nine years. In RealPage, you had conduct that took place over a decade. Domestic Airline, that was 12 years. So as a matter of law, I don't think it matters, Your Honor. But as a matter of fact, I mean, if you look at our complaint, we really do allege that each of them other than Hard Rock adopted this technology around 2010. We know now that GuessRev hit the market, we think, 2009 or 2010. And one chart in defendant's brief that I want to touch on is they show Tropicana as somehow adopting in 2015. That's just not consistent with our complaint. If you look at paragraphs 192 and 193, you'll see that we allege that they started using it around 2011. So, again, I think you're really looking at everybody within a two-year period at most, and you have Hard Rock come later. But, Your Honors, it can't be the case as a matter of law that if an antitrust conspiracy grows years into its operation, that somehow that means the plaintiffs wouldn't state a claim. Otherwise, defendants would have every incentive to just ask someone else a decade later to join the conspiratorial party. So I don't think that that would be consistent with this court's precedent. And, Your Honors, critically, I think, you know, we have alleged that the casino hotels here each provide their confidential data to Rainmaker on a real-time, which it then uses to set the prices that are automatically uploaded into the casino hotel systems. Certainly, Your Honor, I think the four best paragraphs, paragraphs 226, 227, 6, and 358, I think those allegations we make quite clear that the casino hotel defendants understood that the recommended room rates they were receiving were based on real-time, non-public pricing and occupancy data that they and their co-defendants all were providing to the platform. And, Your Honor, I'm glad that I have the opportunity to address confidential information because I think it's key to seeing how our complaint was not the same as the complaint in Gibson. If you look at AR 3 to 4, it's basically the very end of the district court's fact discussion. There, the district court said that we never allege confidential data pooling or co-mingling. And she then relies on that assumption to say that our case is the same as Gibson. But if you look at Gibson, Judge Due there focused on paragraphs 264 and 265 of the complaint. If I understand your theory correctly, based on your complaint, each hotel gave this company proprietary information. That's correct, Your Honor. And the other hotels knew that their colleagues, so to speak, were giving them proprietary information. Absolutely, Your Honor. All that was baked into the algorithm. Absolutely, Your Honor. At bottom, that's your theory. That is essentially our theory. Now, you know, as a matter of law, I don't think that this court or the Supreme Court has ever said that you must show confidential information sharing to state a claim. I think that we have. We have pleaded it that way in part, Your Honor, because, you know, as other federal district courts are considering these theories, I think the real page case really is the best analog. And you can see, you know, Judge Bea's opinion in the Ninth Circuit is quite careful. Footnotes 8, 10, 11, he points to real page, essentially. And says if you allege that, you know, they all knew that their competitors were using the same pricing information or that they were providing confidential information to get the prices back, then that would be a sufficient hub and spoke conspiracy. Of course, the plaintiffs there abandoned the theory, so the Ninth Circuit expressly doesn't reach the question before you today. It would make a difference if it was only public information that was being pooled. Your Honor, I think that if it were purely public information and you had no enforcement mechanisms, then you likely would not have an antitrust conspiracy. But where you have instead competitors with market power who are essentially tying their hands, they're saying that this is an enforcement mechanism. Is there an allegation of an enforcement mechanism here other than kind of the prisoner's dilemma that's mentioned, that each person knows, each entity understands it's their best interest to go along with the recommended rates? Other than that, is there any mechanism? Yes, Judge McKee, there are several. So first, the system actually plugs directly into the casino hotel's property management systems. It automatically uploads the price. You actually have to seek override permissions to turn it off. You know, in times of need and extreme circumstance, that's in our complaint. And here I think it gets back to this sort of actions against interest plus factor. You have to ask yourselves why Caesars or Borgata's revenue management executives would ever tie their own hands and say, you know, I don't want the opportunity to set prices for my property. I'm going to have to seek overrides from this system. So, yes, I do think that we have those policing mechanisms alleged here. Certainly sufficient at the pleading stage to raise fact questions to advance the discovery. I think sort of two answers to that question. The first is, again, you have 80 percent of the market adopting this tool, so it's only natural that you're going to publicly see raised prices. And that is eventually what we see to some degree. You don't see the same degree of parallel conduct. But second, I'd point this court to the AbbVie decision. You know, 976 F3rd at 356, this court said, if a plaintiff plausibly alleges that the anti-competitive effects outweigh its pro-competitive virtues, then the district court must accept the allegation and allow the plaintiff to take discovery. So at most, Your Honor, I think you would have a fact question. You know, we have an economist who obviously will testify as an expert. I'm sure defendants will have several. And, you know, there may be difficult fact questions ahead at summary judgment. But that's not the case that you have before you today. And really all that we are asking is that this court read our allegations with the inferences drawn in the plaintiff's favor. That's been the consistent rule of this court in the Supreme Court since Twombly. And that's unfortunately not what the district court did below. I couldn't figure this out. I'm looking at the charts, which graphically appear very dramatic. But it includes within the years here the COVID pandemic. And that had to have had an impact on occupancy and rates charged for rooms. And I guess also casino profitability. And to what extent should that factor in? Or at this stage, is that totally irrelevant? Your Honor, I think if you look at those charts, what you'll see is that we've sort of grayed out the COVID period. I think we acknowledge that that obviously was an exceptional circumstance. Our class period starts in June 2018. So I think the key fact question when you're looking at price and occupancy movement is the last pre-class period, so 2017, to during the class period. And what you see there, we've got some of these numbers jotted down, is you see, you know, changes. Caesars raised room rates by 36 percent. This is, again, long before COVID. Harrah's by 10 percent. Tropicana, 55 percent. Borgata, 35 percent. At minimum, Your Honor, I think at the pleading stage we have raised fact questions. And I guess I should raise that if this court had difficulty with any of the particular price and occupancy movement, that wasn't a question even addressed by the district court below. So we would seek at least remand to answer that step two question. Tropicana went from $90 to $140. $90 to $140, 24, that's right, 55 percent increase. With a decrease in occupancy. Correct. Which, again, when you see that decrease in supply with an increase in price, I mean, that's classic antitrust conspiracy evidence. That's the kind of thing that, you know, regularly advances at least to discovery. One case, Your Honors, that unfortunately didn't receive sufficient attention in our brief, if I may briefly just touch on it, was the American column and lumber case. And that's a case where basically you had a number of hardwood manufacturers who each used the same outside expert. And they gave that expert, you know, this is what we've been able to supply this month. This is what we've been able to charge. And the expert then would tell them all, you know, via a regular distributed pamphlet, this is what you should do moving forward. The Supreme Court had no difficulty saying that's a per se price-fixing conspiracy. And, you know, even if you look at, you know, Judge Bork's antitrust paradox, Chapter 13, he acknowledges this is classic antitrust conspiracy. This really is the same case. It's just dressed up in new clothes. Instead of an expert, instead of a guy named Bob, you have an algorithm. And we would submit that as a matter of law, the fact that this price-fixing is being done by an algorithm should not make a difference. Certainly, Your Honor. I think ultimately what you're looking for, and I'm sure that defendants will touch on this, is do you have enough to infer the existence of a tacit agreement? And, yes, you're looking for, you know, human inputs, outputs. I think here inputs, they all are adopting this algorithm, knowing that their competitors are doing the same thing. They're getting this letter that shows, hey, Caesar signed up and is charging higher prices. And then they're tying their hands, again, policing mechanisms. They are taking away their own opportunity to set prices and instead sacrificing that opportunity to Rainmaker as the hub. Is part of the human experience here providing this proprietary information? Absolutely, Your Honor. You know, we don't think that this Court needs set some sort of a firm rule that you always need confidential information sharing. But when you have alleged it, it's certainly a strong plus factor to suggest the existence of an anti-competitive agreement. Your Honors, I'm happy to save remaining time for rebuttal, or if I could just very briefly touch on our request for leave to amend in the alternative. Yeah, I was concerned about that. There wasn't really a request for leave to amend, and there was no sample complaint that would be filed if that was granted, as is required by Rule 15. So what do we do with that? Your Honor, I think, you know, here, this was, again, the first opportunity that we had to hear the District Court's potential issues with our claims. We filed our complaint back in January of 2024. It was before we had the Gibson II decision. Courts weren't circling around this confidential information sharing as sort of a key piece. We requested leave to amend in our opposition to the motion to dismiss, and then, you know, subsequently in letters, indicated that we wanted to address Gibson and would be happy to amend. Right. The letters were filed. No motion was filed, and no sample complaint was addressed. That's correct, Your Honor. And I think that the realities of litigation here, you know, we didn't know. We thought our allegations were sufficient as they were, and, in fact, still believe that today. But my guess is everybody who's ever filed a complaint, assuming it wasn't a frivolous lawsuit, thought that the allegations in the complaint were sufficient. That certainly tends to be the case. I guess what I'll say, Your Honor, is that in Fletcher-Harley, this Court was concerned with civil rights plaintiffs. So, you know, if you have a situation where there are broader policy concerns, then perhaps you should give plaintiffs that extra shot. And here, you know, there are scores of absent class members, and I don't want that fact to be lost here. Subsequently, we have found the contract that Sendine enters into with casino hotel defendants. And, you know, at pages 3 and 4, the district court said we never alleged data commingling. We now know that in their contract, they actually had a defined term for it. They called it aggregated data. We take confidential information from all of these different sources. But now you're filing the complaint. You never moved the file. Well, Your Honor, I think the reason that I raised that is because this Court is, of course, always concerned with the equities at play. And there would be many, you know, thousands of absent class members who would never have the opportunity to make their case in this antitrust conspiracy if we were denied even leave to amend. So... And, Your Honor, I think that the timing here makes quite a big difference. When we finished briefing the motion to dismiss long after the complaint was filed, there was no decision from the Gibson District Court and Gibson, too. If you look at the district court's opinion here, every page of the analysis focuses quite a bit on Gibson. I mean, it's nearly every paragraph. Because in your letter, you basically said that you would like an opportunity to respond to Gibson. You didn't file a motion asking these two men to file the attached complaint responding to Gibson, which is totally contrary to Rule 15. Correct, Your Honor. You know, we did not file, you know, a redlined amended complaint. And obviously, if we could go back in time, we wish that we would. You know, I continue to believe today that our complaint, as is alleged, you know, already in the record, is quite different from Gibson. I was just making a suggestion, Your Honor, that to the extent that this court finds that, you know, it is not sufficiently distinct, that we really have found facts subsequently, which would, I think, answer each and every one of the district court's concerns. And, you know, without any analysis of futility, the district court didn't say we could never state a claim. She said there was linguistic equivocation and that we didn't on our pleading. We could directly answer each of the district court's concerns if given the opportunity to replete. I don't think that that's necessary. I think we've done enough to survive to discovery for the reasons this court said in West Penn, Allegheny. But, Your Honor, certainly it is true that we wish that we had filed, you know, a redlined amended complaint at the time before we even knew what the district court was thinking. So with that, Your Honors, unless you have any additional questions, I'll reserve time for rebuttal. Thank you, Mr. Summers. Back to you, Mr. Summers. Back to you. Matt Summers for the American Antidress Institute. Algorithmic collusion poses a grave threat to consumers. Yet, instead of applying a century of longstanding antitrust law, the district court effectively adopted a rule of per se legality. It laid out a playbook for companies that want to price fix with their rivals. All they have to do is join the conspiracy at different times and not share their confidential information. And if they do that, they can get off scot-free and consumers have no recourse. What we hear, say, and not share their confidential information, seems to me, and I'll ask your colleagues on the side about it, seems to me the key thing that plaintiffs have going for them is that confidential information was shared. So I'm not sure I know what you mean by the roadmap to not share confidential information. So I completely agree, Your Honor, that in this case, we have sort of dozens of paragraphs of allegations of non-public confidential real-time information, the confidential information that's being shared. So I think the allegations here are sufficient. I think in addition to that, the legal requirement, the notion that confidential information is a requirement, I don't think holds under antitrust law for a couple of reasons. But I agree that it's not necessary to resolve this case. I think it's an additional reason why the district court erred. Because even if it was just public information, I think the right way to think about it is that there's sort of two directions. There's inputs to the algorithm and there's outputs. On the input side, there's confidential information. And Container Corp, I think, is crystal clear on this. A three-page Supreme Court decision that says that, of course, if you're sharing current prices, that suffices to show a combination of conspiracy. So if you've got it on the input, that's fine. But even if you didn't, I think the critical dimension here is the output, where you've got recommended prices coming from a third party that, as the Supreme Court in American Column in Lumber suggested, if you're outsourcing your pricing, you're essentially delegating it to a third party, and those prices are being recommended and then, with some frequency, accepted by the parties, by the different supposed competitors, that would also be a violation. Sharing prices, that's an interesting concept, because I can go on the Internet right now and tell you the price of all the rooms, of certain rooms in each of these casinos. But I'll tell you what you can't find, Your Honor. You can't find the occupancy rate. You might find if it's vacant or no vacancy, but you won't find the exact percentage of rooms that are available or are occupied at the hotel. You also won't find the individualized prices. You might go on Google and find the prices that are being offered to you, but if there are thousands of different prices being personalized to specific consumers, you can't, as an individual member of the public or a competitor, find that out. And yet, that's the kind of information that was being shared. You've got direct plug-in to the mainframe of these casino hotels, getting the real-time occupancy and even the non-public pricing information is coming out, going into an algorithm that's able to use a single algorithm to recommend prices to many different players in the industry. That's exactly the kind of conduct that the antitrust laws find to be sufficient to show that there is, one, likely an agreement, two, that there was an sort of anti-competitive nature underlying this because sort of price is the most sensitive feature of any market. And I see my time is up. I'll wrap up. I see that, and I think finally, it suggests that there is, you know, if this decision below is affirmed, it would show that, you know, contrary to the Supreme Court and Union Pacific Railroad, that the advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave the antitrust laws behind. I think that's what the district court opinion does here, and I think a reversal would correct that record. Thank you. Mr. Burstein, am I pronouncing that right? It's Burstein, but I'm really not persnickety about it at all. Good afternoon, Your Honors. I'm Boris Burstein. I represent the Caesars defendants, and I'll be here speaking for the defendants at release. Your Honor, plaintiffs' claim here, in essence, is that multiple rival hotels, if they each license Sendine software, that's all it takes to plead a violation of antitrust laws. Why don't you address the confidentiality piece and the sharing of proprietary information? Absolutely. So there are two layers of answers on confidentiality. I'm just going to hip and skip between them. The second answer, which I'll preview for you, is that it's crystal clear under this court's law, in both insurance brokerage and in a Butch case, that that doesn't cut it. Exchange of information does not make, even if they pleaded for exchange of information, that would not do it. I'm going to come back to that because I don't want to seem defensive about the issue. That is about whether they in fact alleged exchange of information, which, as I said, is not enough. And so this is an issue that every court that's looked at this, Judge Dew in Las Vegas, Judge Williams here in New Jersey grappled with. And so let me just go through what happens with this algorithm in some detail. So Senda has a lot of clients. And what the clients do is give their information to Senda and say, help us. Help us display this information in a useful way. Their information. What's in that? Yes. So my client, Caesars, gives Caesars information to Senda. What information? So, for example, how many rooms do we have available for October or for next October? And, you know, at this point, last October, how many rooms did we book a year out? Are we, like, ahead of last year or behind last year? It's proprietary to Caesars. Yes, it is proprietary to Caesars. I know you're getting there, but I have to ask you before I forget it. What legitimate business interest does Caesars have in giving their competitor that kind of proprietary information? And there is the rub, Judge McKee. It is not giving it to the competitor. It is giving it to Senda. You're giving it to an entity. Say it's Bob. You're giving it to Bob because it's used in these materials.  You're giving it to an entity, Bob, whatever, knowing that competitors will have the benefit of that information. Even if they don't get the chapter and verse of the information, competitors will have the benefit of that information and be able to adjust their prices based upon that information. You skipped ahead, though. That is the piece that's not alleged. The piece of the information goes to anybody else. That's the essential piece. It's kind of like saying, look, I might represent Coca-Cola and Pepsi as a lawyer, and I might get information from both. Well, the complaint says such that each casino hotel client provides its current non-public room price. They're not going to see that at Terrainmaker. It does. So I provide it. Caesars provides it to Terrainmaker and gets information, gets back, you know, these charts and curves about Caesars. And the other hotels. And Borgata provides it and gets Borgata information back. That's the key. So now you're getting right to the key, and this is what Judge Du ultimately focused on and what Judge Williams focused on here. The allegation that plaintiffs don't quite make, and this is the key, is that that information is pooled together and the algorithm is run on that information. They come close to beating around the bush. This is the dancing that Judge Williams was referring to. But, in fact, everything they say is consistent with the casino, you know, Caesars giving its own information, getting back various, you know, non-price-related stuff like these charts that help us plan, and also recommendations for pricing based on our proprietary information and public information. And other people's proprietary information. No. That's the thing. And what is the algorithm? They do a legend. Let's look at it. Show me where. 205. 205. They knew that their main competitors were going to use their respective non-public price and supply data for the same price. I'm sorry. Paragraph 205? Yeah. All right. Hold on. Let me just get there.  Casino hotels knew that their main competitors were contributing their respective non-pricing supply data. Okay. They were contributing it. Okay. And used this data, this data, to generate optimal guest room rates. Okay. So the question is, what is this data? They knew that their main competitors were doing the same thing. Yes. But that doesn't get you an exchange of information. Sure. Caesars might be contributing this information and getting back output based on Caesars' information. You're exchanging it with Bob, right? No. Well, again, think about it, like, just outside this context. So I'm an antitrust lawyer. I might advise Coke. I might advise Pepsi. I get proprietary information from Coke. I get proprietary information from Pepsi. Does that mean that Coke is getting advice based on proprietary information? That's what you do with the information. Yes. Yes. You're 100% right, Judge McKee. And so would the real page ‑‑ so there's, like, these real page cases, and there's cases based on Rainmaker, which is the software here. And the line that Judge Crenshaw in real page and Judge Du in cases about this software drew is that what isn't happening here and what they are careful not to allege is that information is never pooled together. That is that when they give us recommendations, they give us recommendations based on the pool of information. And so these words are ‑‑ these are ‑‑ Look at 225.  In agreeing with Rainmaker and later Senden to use their platform and to submit nonpublic pricing, each casino hotel understood that all the other casino hotel defendants had agreed to do the same. Okay, but where does that say the information is pooled? That's the thing. They coordinate the super competitive prices to be set based on the submitted nonpublic data. That's also paragraph 25. Where does it say that? They would coordinate the super competitive prices to be set based on the submitted nonpublic data. Rather than say coordinate, they agreed to the same thing. This is exactly what Judge Williams stumbled on. Each of these is carefully parsed to avoid saying that Sendine ever combines information from Sendine and Borgata. I'm sorry, from Caesars and Borgata. And there's a reason for that. Because I think plaintiffs are rightly concerned about Rule 11 if that happens. And here's ‑‑ let me give you an illustration. These are all like various formulations of the same words. There's one time, only one time in the complaint that plaintiffs cite actually some source about exchange of information. All they really need is one. There's only one. That's all they need, isn't it? Yes, yes. And so if you look at page 40 of our brief. Let's take a look at the complaint again. Look at the last paragraph, bullet point on page 8270. They shared casino hotel defense with respect to competitively sensitive information. That's not enough? Hang on one second. Before the complaint. Paragraph. Last bullet point on page 8270 or page 61 of the complaint. All right. Last bullet? Yeah, they shared. They understood that their co‑defendants also knew that recommended room rates they were receiving from the platform were based on real‑time non‑public pricing and occupancy. Yes, our Caesars. I'm reading from page 61 of the complaint. Yes. Oh, 61 of the complaint. They shared casino hotel defendants' respective competitively sensitive information concerning pricing and occupancy with each other. Isn't that enough? It was during their meetings, which is more direct than I had asked you before. I'm sorry, what did you? I'm sorry, it was during meetings, which is more direct. So it's more than just you spit it into the software, but it's actually you sharing during meetings. Oh, so this sentence has nothing to do with the software. This is some sort of, you know, this is about some sort of undefined meetings, I guess. You're saying there was another conspiracy the plaintiffs don't know about? No, no, no. So if I can just turn to the sources for a second. So there's this one source in the complaint for this whole exchange of information, you know, idea. And if you turn to page 40 of our brief, we basically analyze what that source says. It cites to a website. And what plaintiffs allege in the complaint is that this website says that the tool collects market-specific hotel information from clients' competitors, non-public, real-time pricing and supply data. That sounds very ominous, and they cite a source for that. What that source actually says is that this information is collected not from other competitors, but from hundreds of public websites, branded websites, and online trading travel agencies like Priceline, you know, Expedia. And when we call them out on that in a motion to dismiss, plaintiffs conceded that they misquoted that source. It is the only actual information pointed to in the complaint about the information exchange. Now, you heard my friend, Mr. Fields, say, oh, but we found more. We found an actual contract, an agreement, where there's reference to aggregated data, right, if you recall. So we asked, and this wasn't alleged in the complaint. This is what they wanted to allege in their amended complaint if they were led. And so this finally proves our case. So we asked Mr. Fields, what is this contract? Where did you find it? And he kindly sent it to us. And, you know, I hate to take the court down the road to something that wasn't alleged in the complaint, but it was just brought up in the argument. And so we looked at the provision that says, you know, that says what plaintiff say it says. That is, it combined, that Sendine is allowed to combine data derived from clients, right, and we give them a permission to do that. And then it says, and a part of the plaintiffs don't quote, that Sendine is allowed to do that, quote, for internal statistical or performance analysis only by Sendine. So if Sendine wants to use our proprietary data, CSRS proprietary data, and combine it in any way with anybody else's proprietary data, they can only do it for, quote, internal statistical or performance analysis. This is a document that they say proves their case. And then it goes on to say, and again I'm reading, Sendine represents and warrants to us that the scope of the use of the aggregated data will be limited to the terms of this section. So the very contract that plaintiffs say proves that the data is pooled and, you know, and that's what recommendations are based on, that's what this Court is most concerned about. That actual document says, no, no, no, the only way, the only way that Sendine can pool our proprietary data with anybody else's proprietary data is for its own performance purposes, and it warrants that it won't do it under any other circumstances. And that's what all this language, all this kind of ambiguous language about, well, they base it on competitively sensitive information, but they don't say that it's our own competitively sensitive information, is what Judge Williams called dancing around the issue. But Judge Williams didn't have that document, though. She didn't have that document, but what she had is a complaint that doesn't ever clearly say what they want her to imply. And that's what, you know, I think made clear to her, as eventually became clear to Judge Du, that the plaintiffs here are actually trying to get the Court to read something into the complaint that, as a matter of fact, they are unable to say because they know it's not true. So that's the – I wanted to cover that because I know the Court is concerned about information sharing, as just a matter of fact. But let me talk about information sharing as a matter of law. As I previewed in the beginning, information sharing is not going to get plaintiffs there, even if they had alleged it, because this Court had clear and ambiguous evidence of information sharing in a hub-and-spoke conspiracy, in the insurance brokerage case, and in a Bush case. So let me just talk about the facts of those. In the insurance brokerage case, the conspiracies were between, like, a broker and the insurers, and the conspiracy was to pay contingent commissions. That was the misconduct. The Court found that it was clearly alleged that the insurers all knew that the other insurers were paying contingent commissions, that they all knew the level of the contingent commissions. That is, they knew what the other guys were paying. They even knew what benefits they were getting, their competitors were getting from the broker. And this Court still said, that's not enough. Because in Birch, anyhow, no allegation of parallel conduct or parallel behavior. Judge Greenaway was pretty explicit in saying that the complaint failed to allege that. So I'm glad you asked that, Judge McKee, because I wanted to make sure that we cover the allegations of parallel behavior here. So my friend, Mr. Fields, uses parallel behavior kind of as a shield and a sword. So let me just make, what is parallel behavior a question about? Plaintiffs have to plead in order to get off the ground in a Section 1 conspiracy case that the defendants behaved in a suspiciously parallel way, so suspicious that it must have been because of a conspiracy. So that's what their evidence has to show. And when we say, no, no, no, it doesn't show, your allegations don't show that at all. They say, oh, no, no, no, we're going to put on some experts, this is too facty. Well, it's they who have to show that their facts, if those facts were true, would actually show suspiciously parallel behavior. So there's two things that are supposedly parallel here. But neither of them, even on the face of it, meets a parallel conduct standard. One is the timing of the casino defendant's adoption of licenses. So Caesars started using Send-In products, they allege, in 2004. And then additional hotels started doing that five years later. And then they say conspiracy eventually began when Hard Rock started using it in 2018. So 14 years passed between the time Caesars started using it and then additional hotels started using it and the conspiracy began. How is that parallel conduct? According to Plaintiff's brief, that is near simultaneous adoption. It's only near simultaneous on geological time. And it surely doesn't prove so. Geological time? I like that. It surely isn't behavior that is so suspiciously parallel that it suggests a conspiracy. If this whole thing was a conspiracy, why would Caesars start using it five years before anybody else if the only reason to use it was to be in conspiracy? It doesn't even make any sense. Their second sort of allegation of parallelism is the movements of price and occupancy. So we have a chart in our brief, which you might remember. It's on page 13 of our brief. It shows movements in price during the class period. So there are three defendants. There's the Caesars hotels. There's Borgata hotels. There's Hard Rock. And then Plaintiff's alleged data for non-defendants. So if you look at that chart, page 13 of our brief, it shows, I think in blue, the Caesars prices, and in orange, the non-defendant prices. And they're moving exactly the same way. So how does that show a conspiracy involving Caesars? Caesars is doing exactly the same thing that the non-conspirators are doing. And what about the other conspirators, the non-Caesars? Their prices are going down. So how is this evidence of a suspicious conspiracy to raise prices up if two of the three defendants are driving prices down and the third is doing what non-conspirators are doing? The only rational inference from the evidence plaintiffs plead here is that there is no conspiracy. So now plaintiffs have an answer to this in their reply brief. It didn't quite come up in their argument, but it might come up in their reply, so I want to make sure I address it. They say, well, 2018 isn't the right year. You should really look at 2017 to 2022, so the year before the conspiracy. Okay, let's do that. So because they don't have data for a few of these hotels for 2017, we can only look at a few. So there's Caesars, Borgata, and there's two of the non-defendants. So remember, this is a conspiracy to decrease occupancy, so there's more available rooms and prices go up. So of the four hotels for which we have data, or which plaintiffs allege data, 2017 to 2022, which have the steepest drops in occupancy?  Drop in occupancy is bad, that side of conspiracy. You would think that that would be the conspirators, but actually the two non-conspirators have bigger drops in occupancy, according to their own allegations, 2017 to 2022, the years they just picked, than the conspirators do. So how is that evidence of behavior that is so suspicious that we can infer a conspiracy to reduce occupancy? And if you're... Probably not beyond the 12v6 dismissal. This was, the complaint was dismissed under failure to state a claim, and you're really making a factual argument as to the proof that would be admitted. I respectfully, Judge McKee, I strongly disagree with that, because this is how, it is, the whole teaching of Twombly, the whole teaching of it, is that it is on the plaintiff's pleading to come up with allegations that, if true, prove something that is so suspicious that it, there is a plausible inference there must have been a conspiracy. So let's just remember what happened in Twombly, right? So Twombly was about telecom companies, and the plaintiffs allege, you know, telecom companies, they were deregulated a long time ago. You know, they used to be regional mobile companies. We all remember that. And weirdly, they don't invade each other's territory. They just stick to their own. It must be a conspiracy. That was one of the allegations. And the Supreme Court, in an opinion by Justice Souter, said, well, that's one reading of it, but that doesn't pass the test of plausibility. Why? Because there is a perfectly rational explanation for why they were doing what they were doing. You know, as the court said, everyone knows the adage about a person who lives by the sword dies by the sword. And so maybe that's why they were doing what they were doing. If the court followed the, well, they see something that sounds a little bit like maybe there's some possibility there's something going on here, we should just let it, we should just roll the dice and see if something comes up in discovery, that case would have come out differently. And that in really all the case law after Twombly follows. Let me, unless the court has questions about any of these subjects, turn to the acceptance rate. So, Judge McKee, you started the question of Mr. Fields there. So there's one allegation about how often these rates are accepted. That is across the population of all clients that Sendine has, of which there are alleged to be tens of thousands. You're saying, I think this is where you're going, the 90% is the acceptance rate for the universe of clients, not these hotels. Is that what you're saying? Well, I have really two things to say about that. One is, yes, that's classic group pleading. Because it's true of everybody, it must be true of defendants. So I just Googled while I was listening to the copyright argument. It turns out that the average height of a male in the United States is 5'9". So I guess that makes Mr. Fields and me 5'9", which probably means we're both winners today. That doesn't stand to reason. It's just classic improper group pleading. The second point I would make is, let's go with the plaintiffs on this. I'm not sure I followed that. Nor am I sure I want to. I use that statistic all the time. I do want to be 5'9". Elevator shoes, bro. But let's just assume, let's assume for the argument, that the allegation that tens of thousands of users of Sendine adopt their recommendations 90% of the time, and that means that every individual one does as well. So each of the three hotel defendants did the same. What would that show? That would show that each of the three hotel defendants behaved in exactly the same way, that tens of thousands of users of this product that are not alleged to be in a conspiracy are doing. So how could that possibly be evidence of conspiracy, if what you're doing allegedly is exactly the same thing that non-conspirators are doing? And then let me just touch on one concept, unless the Court has other questions, which is that this is a kind of a case that's basically like, did you do this knowing that your competitors were doing it, and does that put you in agreement? That's basically the legal framework. And this Court was very, very precise in the insurance brokerage case about what the legal test, what is it that plaintiffs have to plead to essentially proceed with a case of this type. And the words this Court used is, plaintiffs have to plead that it would be economically self-defeating to do this. Economically self-defeating, that's the phrase this Court used, if it weren't for a conspiracy. Which is why I asked you my initial question. Yes. And there's nothing in this complaint that shows why it would be economically self-defeating. But there's plenty of allegations in this complaint that show why it's not economically self-defeating to use Sendai. So I'll give you examples. They allege that tens of thousands of hotels use Sendai. All but three of them are not in a conspiracy. So how could it be economically self-defeating to use this service if it wasn't for a conspiracy, if nearly everyone who uses it is not alleged to be in a conspiracy? So that's point one. Point two, they allege that Caesar started using these products years and years and years before everyone else, before it's alleged to be a conspiracy. He's got no one to conspire with. The other defendants weren't. See, that argument I find underwhelming, because no conspiracy has to simultaneously begin with all of the members of the conspiracy at exactly the same instant. People can come. People can leave. That's exactly the argument we heard from Mr. Fields. But yes, but it goes to a completely different point. So take 2004. Was there a conspiracy then? Who did Caesar conspire with? The other defendants weren't using. They weren't using Sendai. There's no agreement. There's no allegation that in 2024 the hotels agreed that they're going to take turns using Sendai. Hard Rock, one of the defendants, hasn't even been opened yet. Did Rainmaker even exist in 2004? Yes, it is. Allegedly. We'll stick to allegations. And it was launched in the early 90s. So in 2004, Caesar's adopted it. Then other hotels started adopting. So at the time when Caesar's adopted it, no co-conspirators were, you know, nobody in conspiracy was using it. How could you say they would be economically self-defeating to use it if it wasn't for a conspiracy? And then finally, the complaint is replete with allegations, which, you know, I think are true, about all the other non-price recommendation-related features that this suite of software has. You know, I mentioned these curves, which is how allegedly, and I think in fact how Caesar's used it. That's just our own information being displayed to us. The complaint alleges that this software, for example, it can distinguish between legitimate group requests, like we want to hold your conference in a hotel, and kind of spam ones. It can flag really high-value ones. There's all these things this software does that have nothing to do with room recommendations. Allegedly. So how could it be economically self-defeating to use it if it wasn't for a conspiracy about room recommendations? Unless the court has any other questions, I think I may have exhausted your patience. Thank you very much. I am 5'7", on a good day. So there's a lot to get to here. Let me just start. I'm actually surprised that Mr. Bershteyn went there. So let me start with the contract. That's not part of this case.  Of course, Your Honor. I was going to ask actually whether or not contracts. Of course, Your Honor. I'll just say minimally there would be a fact question there, but I think that it was misread. Second, Your Honor, I want to go to his analogy. So Mr. Bershteyn says, you know, perhaps I represent Coke and Pepsi. If Mr. Bershteyn represented 80% of a relevant market, learned confidential information, and then told those clients what to charge, that absolutely would be an antitrust conspiracy. I mean, that's a guy named Bob. That's American Column and Lumber. Mr. Bershteyn, of course, would never do something like that. But I think that it helps to explain why the analogy doesn't quite work. It's also key to recognize that in his analogy, Mr. Bershteyn would – you know, he's an attorney. He has heightened ethical and fiduciary responsibilities. Rainmaker here is holding itself as providing prices. It's not offering a service to provide generalized legal advice to competitors in a marketplace. Its main offering is we'll tell you what to charge to optimize your revenue. So I don't think it works for a number of reasons. Third, I think Your Honor's hit on some great paragraphs from our complaint. I just want to make sure that four are in the minds of your chambers. You know, Paragraph 6, I think we get right to that confidential data use. Paragraphs 226 and 227, we say that they were knowingly sharing competitively sensitive information. 358, they submit their real-time, non-public pricing and supply data, which uses this data. I think over and over again, we really did make precisely the allegation that Mr. Bershteyn said that we did not. One thing that didn't come up at the top is the additional allegations we have of a traditional conspiracy. And this Court has often looked to that as another plus factor. If you look at Paragraph 229 and Footnote 5 of our complaint, we make clear that the very same individuals who developed, marketed and sold the algorithm that is at issue in RealPage, developed, marketed and sold the precursor to guest rev and group rev, which are really the heart of the claims in this case. And the Department of Justice opened an investigation there. Twelve state attorneys general have brought actions over those same individuals. So I think we at least have alleged, you know, traditional evidence of a conspiracy. Mr. Bershteyn says, well, you know, every hook and arrow has been mentioned. I don't know which way this cuts, but there was the Supreme Court case, and I just remember the NFL case, I can't remember the full name of the case, where the court was cognizant to state that we must be aware of the fact that in developing antitrust law, antitrust law can't be stagnant and has to take into consideration various changes in competition and in technology. Absolutely. I think that's right, Your Honor. I'm glad you asked the question, Judge McKee. I think you're thinking of American Needle. And what the Supreme Court goes on to say there is, you know, ultimately the Sherman Act is concerned with independent centers of economic decision making. We want a competitive market where casino hotels in Atlantic City are each competing with each other to charge consumers the lowest price. And instead what we have here is 80 percent of the market tying their hands, saying tell us the price to charge and we'll overwhelmingly adopt it. In fact, we need override permissions to even get out of the system. They advertise themselves as using that feature to each of the competitors. So I think that you're precisely right, Your Honor. I don't think that this case raises novel questions. And in many ways I think that the more aggressive move here would be to affirm the district court's ruling below, to just sort of rubber stamp it, because then what you have, you have the rainmaker factors moving forward. Defendants know, you know, don't put this in a contract. Don't say that you're going to have enforcement mechanisms. Don't collect confidential information or at least don't say it. And plaintiffs would not be able to get under the proprietary hood of these black boxes to know how they're working. You could have staged discovery. I mean, there are a number of different ways that the courts could deal with this. I think the way that the real page court has chosen to deal with it, look at inputs, look at outputs, makes lots of sense. Here we have alleged competitive data is pooled, commingled. It's used by this algorithm to generate its pricing outputs. Mr. Bernstein mentions insurance brokerage. I'm not sure why that case he thinks helps defendants. I mean, there, you know, without a formal sort of red line complaint, the plaintiffs had three different opportunities, three times to amend their pleading before the district court finally dismissed it. This court actually sent one of those claims back. You didn't have any policing mechanisms. And ultimately, that resulted in a quarter billion dollar settlement in favor of the class in that case. So I'm not sure how that case quite gets them there. The policing mechanism here, is it just the prisoner's dilemma, the shared interest, the commonality of interest, or is it something more? No, Your Honor. So Rainmaker actually scores casino hotels on a daily basis based on the rate at which they accept the pricing output. So they're scoring them every day. You have to have these override permissions. Again, you know, if you're using a system. That scoring is for, I assume, the internal hotels or for Rainmaker benefit, assuming public doesn't. Your Honor, that's going to be one of the first questions I would like to ask in a 30B6 deposition. How are those scores used? Are they then giving discounts, for instance, based on the scores? Do they publish the scores? We haven't been able to identify them publicly. But I think it gets to a key sort of fact about the posture of this case. Everything in our complaint, we alleged without a single document obtained in discovery, without a single question asked at a deposition. And at this stage, you know, you don't take, well, Mr. Birchline says you could potentially see something in defendant's favor. That's, again, your West Penn Allegheny. Antitrust plaintiffs, you don't have some extra bite under Rule 8. If you have alleged sufficient facts to infer the existence of a conspiracy, you get to move forward to discovery. Birch, Mr. Birchline mentions Birch. There, this court was only able to distinguish container court because of the market power. There, they said, well, container court, it had close to 90% market power. That's very different than was the 30-some percent in Birch. Here, we've got 80%. And that's another key difference between our allegations and those in Gibson. There, you had 35% of the casino hotels on the Vegas Strip using Rainmaker. Here, we've got 80%. I think that that is a key distinction. Mr. Birchline talks about timing. And he says, well, Caesars adopted the products in 2004. Candidly, Your Honors, I don't know how he can say that because GuestRev was not available until at least 2009 or 2010. Predecessor products, you know, are not the heart of our claim. And I think that goes to the paragraph that, you know, they point out in their brief, paragraph 160. That involved RevCaster. It's a separate product. It wasn't really the focus of our briefing on appeal because we have learned that, for the most part, it appears, at least, that it was using public data. Not true of GuestRev and GroupRev, which is why they've really been the heart of our case. Sixth, you know, he sort of goes to, again, the pricing movement. And this time today, he says, well, let's compare 2017 to 2022. Again, that doesn't quite work as a matter of fact because you've got to look at the pre-conspiracy period to the start of the conspiracy. 2017 to 2018, we do that in our reply brief, and I think you can see it there. Overall, Your Honors, you know, I think it's important to recognize that were this court to affirm, you know, you really would be setting a heightened standard for plaintiffs to plead in these changing cases, as you pointed out, Judge McKee. And I think so much of what we've talked about today sounds very fact intensive because they really are fact questions. If Mr. Berstein is right, they're going to have great arguments at summary judgment. But that's not the posture of this case, and we would ask that this court reverse the district court's opinion below or minimally send it back with instructions that we receive leave to amend. I'm happy to answer any additional questions. Otherwise, I thank you for your time. We're going to ask the parties to speak to Mr. Williams here about the order and transcript of this argument, and that they'll split the costs. Of course. Thank you, Your Honor. Thank you very much, counsel, for your arguments and your briefs. Thank you.